UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELISA STEPHENS, et al.,

        Plaintiffs,

    v.

LIBERTY MUTUAL, et al.,

        Defendants.

_____/

No. C 05-0213 PJH

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

Defendants' motions for summary judgment came on for hearing before this court on January 16, 2008. Plaintiffs appeared by their counsel Neil D. Eisenberg, Jaemin Chang, and Curtis Smolar; defendant Westchester Fire Insurance Company ("Westchester") appeared by its counsel Lisa Le Nay Coplen; and defendant Liberty Mutual for Employers Insurance Company of Wausau ("Employers") appeared by its counsel Joyce C. Wang and Nancy J. Strout. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motions.

**INTRODUCTION**

This is a dispute regarding insurance coverage. Plaintiffs Elisa Stephens ("Stephens"), University of Art University, Inc., and Academy of Art College, Inc. (collectively, "plaintiffs" or "the Academy"), own a building located at 655 Sutter Street in San Francisco ("the Academy building" or "the 655 Sutter building"). The building is used as a student dormitory.

The building was insured under a policy of commercial property insurance by

defendant Westchester during the period September 1, 2001 to September 1, 2002, and under a policy of commercial property insurance by defendant Employers during the period September 1, 2002 to September 1, 2003.

Plaintiffs allege that the Academy building suffered damage as a result of the demolition of an adjacent building owned by the Olympic Club, and the construction of a new parking garage at that site. Plaintiffs assert that some of the damage occurred during the period of time covered by the Westchester policy, and other damage occurred during the period covered by the Employers policy.

The Academy submitted claims to Westchester and Employers, but the claims were denied. Plaintiffs then filed suit alleging breach of contract against Westchester, and breach of contract and breach of the implied covenant of good faith and fair dealing against Employers. Westchester and Employers now seek summary judgment, asserting that the alleged damage to the Academy's building was not covered by their respective policies.

**BACKGROUND**

The 655 Sutter building was originally constructed after the 1906 San Francisco earthquake and fire, with unreinforced masonry walls and wood-framed floors. The building has six stories plus a basement, and was previously seismically strengthened. The Academy purchased the 655 Sutter building at some point between 1997 and 1999, and converted the upper floors from commercial to dormitory space.

In late 1999 or early 2000, the members of the Olympic Club decided to remodel the Club's facilities. Part of the project included the demolition and removal of an existing two-story parking structure located at 665 Sutter Street, west of and adjacent to the Academy's 655 Sutter building, and the construction of a seven-story parking structure with four below-grade levels.

The Olympic Club hired a firm of environmental and geotechnical consultants, Treadwell & Rollo, Inc., to conduct a pre-construction geotechnical investigation. Treadwell & Rollo reported that the project would require excavating approximately 61 feet below the Sutter Street grade to construct the basement of the parking structure, and indicated that

shoring and underpinning would be required to maintain lateral and vertical support of adjacent improvements.

Plaintiffs became aware of the Olympic Club's plans to demolish the parking structure around January 2001. On February 5, 2001, the Academy received a letter from the Olympic Club explaining the scope of the planned project. The Academy asked Edward Conlon ("Conlon"), a licensed contractor (and Elisa Stephens' husband), to head up plaintiffs' "peer review" committee for the Olympic Club project.

Plaintiffs, through Mr. Conlon, retained the engineering firm of Degenkolb Engineers of San Francisco ("Degenkolb") in January 2001, to review the Olympic Club's shoring and underpinning design. On August 1, 2001, Degenkolb issued its peer review recommendations.

On August 21, 2001, Treadwell & Rollo issued a report responding to the Degenkolb report. Treadwell & Rollo stated, "On the basis of our exploration and the results of Engineering Analysis for 665 Sutter Street, we conclude less than 1" of differential settlement could occur beneath 655 Sutter Street, east and west foundation elements."

On September 1, 2001, Westchester's policy of commercial property insurance on the 655 Sutter property became effective.

On November 21, 2001, Degenkolb issued another report, indicating that it had received a memorandum dated September 6, 2001, from the construction manager for the Olympic Club project, responding to the comments in Degenkolb's August 1, 2001 report. Degenkolb stated, "In general, we believe the design team has appropriately responded to our comments," although it noted that "a few outstanding issues" remained.

In April 2002, the Academy began to investigate the costs of relocating the students from the 655 Sutter building to an offsite location during the excavation.

On May 13, 2002, the Olympic Club began the demolition of the existing parking structure. At about that time, the Academy retained the firm of Holdrege & Kull as consulting engineers and geologists as part of the peer review process.

On June 5, 2002, plaintiffs wrote the Olympic Club to advise that the Academy would

3

be unable to have students living in the dormitory building during the excavation phase of the project.

On June 25, 2002, the Academy's attorney Neil Eisenberg submitted a claim to the Academy's broker, Acordia of California Insurance Services ("Acordia"), asserting possible damage to the 655 Sutter building resulting from the demolition and excavation. Mr. Eisenberg wrote,

> Commencing in May the Olympic Club and its contractor, Plant Construction, have subjected the Academy's property to continuous damage. This has consisted of dumping demolition debris on the property, causing severe vibrations, and subjecting the property to extreme construction noise.
>
> On June 24, 2004, Plant's subcontractor, Cleveland Wrecking, actually struck the side of the building with the bucket of its excavator. This shook the building and knocked off bricks.
>
> As a result, . . . the Academy was forced to evacuate its building[.]

On July 2, 2002, Acordia submitted a property loss notice to Westchester, stating that "insured incurred consequential damages as result of building being struck by excavator eqpt of contractor doing work on adjacent bldg. See Attorney's letter for further explanation of loss." (This last is apparently a reference to Mr. Eisenberg's June 25, 2002, letter.)

On July 22, 2002, Donald Olsen of Holdrege & Kull reported that he observed a cavity or void in the soil, which extended across the sidewalk to the east where the Academy building foundation was exposed, and stated that the cavity indicated possible settlement of the soil.

Mr. Olsen stated further that Holdrege & Kull "could not determine whether the cavity developed in the past from settlement of the underlying loose fill soils or whether it occurred recently as a result of the vibrations from the on-going demolition activities taking place on the Olympic Club property," adding that "[t]he development of settlement induced cavities is not unexpected on the basis of the relatively loose, sand, fill and native soils . . . below the existing ground surface."

Also on July 22, 2002, Stephens and the Academy's consulting engineer Amir

4

Firouz, of ESE Consulting Engineers, observed a large crack (23 feet long, 1/2 inch wide, and 11 inches deep) in the northern segment of the west exterior wall of the Academy building (the wall next to the Olympic Club site). Mr. Firouz subsequently described the wall in question as "an old concrete wall directly below an existing un-reinforced masonry wall."

On August 5, 2002, the Academy signed a lease with the Cathedral Hill Hotel to house its students from August 12, 2002, to June 1, 2003. These were the students that would otherwise have been housed at 655 Sutter Street.

On August 15, 2002, Mr. Olsen wrote the Academy to report that he had observed several cavities that "could have developed as a result of machine induced vibrations caused by the demolition and excavation activities being performed on the Olympic Club property."

Mr. Olsen noted that in previous exploratory boring, "the soil encountered beneath the [Academy's] building consists of relatively loose, sand fill and relatively loose native sand soil to depths of [more than 20 feet]." He recommended applying a chemical grouting material to the soil, to a depth of 25 feet, to prevent further settlement, and provided the Academy with an estimate for "remedial grouting" in the amount of $580,000.

On August 28, 2002, Stephens wrote Acordia to report continuing damage caused by the Olympic Club project, including movement of the building, broken windows, non-functioning windows as a result of vibrations, cracks in the concrete fire escapes, and a 12-foot crack in the building.

The Olympic Club had been preparing to shore up the Academy building during the excavation and construction of the parking facility by means of an internal bracing or shoring mechanism. The Academy believed that the internal bracing or shoring method posed significantly increased potential for damage to the Academy's building. Thus, on August 28, 2002, the Academy agreed to permit the Olympic Club to enter the 655 Sutter property pursuant to a license agreement.

This agreement granted the Olympic Club a limited license to enter the property in

order to underpin the west wall foundation of the dormitory of the property; install temporary

tiebacks for the Olympic Club's property line shoring; conduct crack surveys; conduct

survey reports to record movement or settlement of the dormitory; epoxy cracks and the

cold joint in the west wall of the dormitory; excavate an exploratory pit along the east wall of

the dormitory from inside the dormitory; perform chemical grouting under the dormitory's

west wall; use and restore a sidewalk, constructing a temporary walkway in the meantime;

confirm wall capacity and pier strength; and provide plans for maintaining lateral support

until tiebacks were installed.

On September 1, 2002, the Westchester policy period expired, and the Employers

policy went into effect with an endorsement expressly excluding business interruption

coverage for the 655 Sutter building.

In September 2002, work commenced for the preparation of the underpinning,

installation of tiebacks, and shoring for the 655 Sutter building.

On September 19, 2002, the Academy received a Project Memorandum from Mr.

Firouz. He noted the presence of a large pre-existing crack in the west wall of the 655

Sutter building, but indicated that without detailed analysis, he could not determine the full

significance of lateral force resisting capacity reduction (if any) as a result.

Mr. Firouz described the crack as having been "initially noticed after the Olympic

Club demolished and removed adjacent concrete and masonry walls & footing on their

property."

On September 23, 2002, the Academy received another Project Memorandum from

Mr. Firouz. He noted that "[t]he soil report by Holdrege & Kull had previously warned that

due to loose fill and soil in the top 20 to 30 feet of the site, vibration compaction of these

loose soil layers due to demolition and construction activities should be expected." He

added, "We expect large voids to have been introduced under the basement slab [in the

655 Sutter Street building], and we expect those voids to increase in size as more vibration

is imparted to the building."

Mr. Firouz reiterated that "[t]here is a 1/2 inch wide and approximately 23 feet long

horizontal crack in the northern segment of west wall." He stated that the crack, which he described as "more than 11 inches deep," had "resulted in a large reduction in the lateral force capacity of this wall;" and that it "was discovered after jack hammering, cutting, demolition, and removal of deep foundation beam/walls on the adjacent Olympic Club property."

On September 27, 2002, the Academy received a further Project Memorandum from Mr. Firouz. He had reviewed settlement monitoring data provided by Martin M. Ron Associates ("MMRA"), and stated that, based on such review, "no building movement has been measured by MMRA."

On October 2, 2002, the Academy received another Project Memorandum from Mr. Firouz, in which he stated, "I observed the previously marked wall cracks and did not notice any sign of crack propagation or enlargement."

On October 9, 2002, Mr. Olsen wrote regarding a site visit on October 2, 3, and 4, 2002, in which Holdrege & Kull observed the soil conditions exposed in the bottoms of the exploratory jacking pits currently being excavated by the drilling subcontractor.

Mr. Olsen stated, "We observed the thin glass plates that were glued across bricks and cracks on the exterior surface of the [Academy building's] west wall prior to excavating the jacking pits. All but four of the glass plates were intact and indicate no movement at each location. The four broken glass plates were probably inadvertently broken by [the drilling subcontractor]." He concluded, "The silty fine sand soil observed at the bottom of [three of the jacking pits] all appears to be considerably more competent than what was expected. The glass plates and slope indicators do not show any significant movement of the [Academy] building at this time."

At some point in October 2002, Mr. Firouz began noticing excess water around the construction site. In his opinion, the water was from a broken water line, which he believed had compromised the integrity of the soil beneath the building and had caused differential settlement of the soil.

On February 4, 2003, the Academy submitted a claim for damage to Employers. On

July 15, 2003, after reviewing the documents provided by the Academy to Employers' adjustor Richard Thompson, via Westchester's adjuster,[1] Employers denied the claim, on the basis that there was no evidence of covered property damage during the Employers' policy period. Mr. Thompson advised the Academy that it should notify him if it had any evidence of such discrete damage during the policy period, and that "[a]bsent such documentation, we will suspend our investigation and adjustment, and close the file August 18, 2003."

On September 5, 2003, Mr. Eisenberg wrote Mr. Thompson, stating that "[t]here were clearly incidents that have taken place during the Liberty Mutual policy period that have resulted in significant damage," and that "[c]losing your file is not appropriate at this time." He suggested that "[p]erhaps a meeting with our engineer would be helpful to clarify those incidents that clearly fall within the Liberty Mutual policy period." He also suggested that Employers might participate in a mediation that the parties had "tentatively" agreed to schedule at JAMS for "some time in" October 2003.

On September 25, 2003, Mr. Thompson responded to Mr. Eisenberg's September 5, 2003, letter (which Employers had received on September 10, 2003). He stated that as the Academy had failed to provide the documentation of a covered loss that he had requested in his July 15, 2003, letter, the file remained closed and Employers would not participate in any mediation.

On December 24, 2003, the Academy filed suit against the Olympic Club and its general contractor Plant Construction Company in San Francisco Superior Court (Academy of Art College v. San Francisco Olympic Club, No. CGC-03-427640) ("the state court action").

As a result of the Academy's claim, Westchester retained the engineering firm of Wiss, Janney, Elstner Associates ("WJE") to conduct an investigation into the alleged

---

[1] The Academy opted to have Westchester make copies of the documentation the Academy had submitted in support of its claim, and forward that documentation to Employers. According to Mr. Thompson, Employers did not receive the documents until June 28, 2003.

"differential settlement" of the 655 building.

Based on its investigation, WJE concluded that the excavation and construction work on the Olympic Club project had not resulted in substantive changes or structural damage to the Academy building; and that even if there had been some settlement of the Academy building, it occurred after October 2002.

Specifically, WJE stated in a report issued on January 12, 2004, that after making numerous site visits "to determine and document the condition of the building and review of documentation made available to us," and after meeting with representatives of the Academy to learn about the effects of the construction,

> we have been unable to identify any damage – substantial or otherwise – that can reasonably be attributed to the nearby construction activities. The existing condition of the masonry walls is reasonably good considering their age. We observed only minor cracking in the masonry, whose occurrence we determined to be unrelated to the recent construction, largely based upon various types of physical evidence we observed at or around those cracks and upon our knowledge of the behavior of brick masonry structures.

WJE also studied the data developed by the other engineering firms that had evaluated the condition of the building – noting that one body of data pertained primarily to the demolition phase (demolition of the Olympic Club building) and the other body of data pertained primarily to the excavation, shoring, and underpinning phase.

> Based on these reviews, it is our opinion that the demolition activities did not cause substantial damage to the building, and the physical condition of the building bears this out. It is also our opinion based upon elevation changes reported to have occurred in the fall of 2002 that the excavation, shoring and underpinning activities had the potential to cause wide visible cracking in the masonry, but did not do so as evidenced by the current condition of the building.

After WJE issued its January 2004 report, the Academy provided WJE with copies of 447 pre-construction survey photographs taken by Degenkolb on May 10 and May 30, 2002. During four days in March 2004, WJE toured the Academy building and attempted to re-photograph every area photographed by Degenkolb. Although WJE was unable to reproduce all the photographs, it did re-photograph 420 of the locations. WJE then issued a supplementary report on April 7, 2004, in which it provided a side-by-side comparison sampling of 34 of the before-and-after photographs.

WJE chose those particular photographs "because they show the conditions of the parts of the [Academy building] closest to the adjacent construction and are concentrated in those areas where the largest vertical 'settlements' were reported." Based on the comparative study, WJE found that "the brick masonry exhibits few if any changes during the period between the two photo surveys."

In particular, "[d]istress, missing mortar and other conditions apparent in the [Degenkolb] photos are visible in the WJE photos and these conditions appear unchanged. More importantly, areas of the walls in which distress is not apparent in the [Degenkolb] photos do not exhibit distress in the later photos." WJE concluded that "these findings demonstrate that the excavation and construction on the adjacent property did not result in substantive changes to the structure, as has been alleged."

On April 29, 2004, plaintiffs filed the present action in San Francisco Superior Court, alleging breach of contract against Westchester, and breach of contract and insurance bad faith against Employers.

On May 11, 2004, after a lengthy investigation and the submission of the two reports by WJE, Westchester denied the Academy's claim. Among other reasons, Westchester based its denial on the fact that the alleged damage was not caused by a "fortuitous event," and on the fact that recovery for the alleged damage is precluded under the policy's "faulty workmanship" exclusion.

In June 2004, the Academy submitted a further claim to Employers, asserting that the Olympic Club construction activities had caused voids beneath the soil. On June 28, 2004, Mr. Thompson inspected the Academy premises with two engineers from Exponent Engineering – Brian McDonald and John Burton. Exponent had been retained to advise Employers about the Academy's claims. Mr. Thompson and the two engineers also met with Mr. Firouz. Mr. Thompson wrote to the Academy on June 29, 2004, July 14, 2004, and August 31, 2004, to advise that Employers was continuing to review the claim.

Mr. Thompson received an initial report from Mr. Burton regarding the sub-slab voids beneath the soil in August 2004, and a supplemental report in September 2004. Mr. Burton

concluded that the Academy building had not sustained damage from the voids, and that in any event, the voids were not caused by the construction project. Mr. Thompson received Mr. McDonald's report in September 2004. Mr. McDonald concluded that the Academy building had not sustained property damage from the alleged soil settlement.

Defendants removed the present action on January 13, 2005, alleging diversity jurisdiction. On March 21, 2005, plaintiffs filed a first amended complaint ("FAC").

On June 23, 2005, at the case management conference, the parties proposed a stay of the present action until after the negligent construction action (the state court action) had been resolved. The court stayed the case until February 23, 2006, for a further case management conference.

On February 14, 2006, the parties again requested a continuance. They advised that because the investigation was ongoing, they did not anticipate a trial in the state court action until September 2006. The court granted the request, and extended the stay until October 5, 2006.

On October 5, 2006, the court lifted the stay and set pretrial dates. The parties indicated that they were attempting a global mediation. The trial date was set for November 26, 2007. On May 3, 2007, the trial date was continued to May 5, 2008.

On December 12, 2007, both Westchester and Employers filed motions for summary judgment. Westchester argues that plaintiffs can point to no fortuitous event that caused direct physical loss or damage to the subject property, and that even if there were such an event, such damages are excluded under the policy.

Employers asserts that plaintiffs have no business interruption coverage under the Employers policy, that the loss originally manifested itself before the Employers policy became effective, that all potential causes of the settlement damage are excluded, and that a bad faith insurance claim cannot be maintained in the absence of a viable claim for breach of employment contract.

The trial in the state court action was conducted in October-November 2007, and the parties made closing arguments on November 14, 2007, but there appears to have been no

decision issued yet.  On December 14, 2007, the plaintiffs in that case filed a motion to reopen, based on the alleged discovery of new evidence of property damage.  The court has not yet ruled on that motion.

**DISCUSSION**

A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.  Regardless of whether plaintiff or defendant is the moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

The court is required to view the evidence in the light most favorable to the nonmoving party.  United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir. 2003). However, a trial court can consider only admissible evidence in ruling on a motion for

summary judgment. See Fed. R. Civ. P. 56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988). Authentication is a "condition precedent to admissibility," and this condition is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The Ninth Circuit has repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment. Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002).

Self-serving affidavits will not establish a genuine issue of material fact if they fail to state facts based on personal knowledge or are too conclusory. Rodriquez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001). In addition, deference to the non-moving party has some limits. Thus, a plaintiff cannot rest on the allegations in the pleadings to overcome a motion for summary judgment. Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995); Ghebreselassie v. Coleman Sec. Serv., 829 F.2d 892, 898 (9th Cir. 1987).

The interpretation of an insurance policy is a question of law. Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (1995). Thus, it is the court's responsibility to determine coverage issues. Parsons v. Bristol Dev. Co., 62 Cal. 2d 861, 865 (1965). Exclusions in insurance policies are to be strictly construed. See, e.g., MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 648 (2003).

B.     Westchester's Motion

Plaintiffs allege a single cause of action for breach of contract against Westchester. Plaintiffs seek compensation for physical property damage and for loss of business income resulting from the relocation of the students from the 655 Sutter building during the excavation phase of the construction project.

Westchester contends that plaintiffs have not demonstrated the existence of any disputed material fact that would preclude summary judgment in this case. Westchester argues that the Academy can point to no fortuitous event that caused direct physical loss or damage to the subject property; and that, even if there were such an event, such damages are excluded under the policy. Westchester notes that plaintiffs have consistently asserted

13

1   that faulty and/or negligent construction was the cause of the loss.  Westchester argues

2   that that type of loss is clearly not covered under the Westchester policy. Thus,

3   Westchester asserts, plaintiffs have not presented a covered cause of loss.

4       Because the court finds that the loss claimed by plaintiffs is excluded under the

5   policy, the following discussion addresses only the second basis for Westchester's motion.

6       1.    Plaintiffs' Evidence

7       Plaintiffs' only evidence consists of 23 exhibits (Exhibits A-W), purportedly

8   authenticated by Ms. Chang.  Exhibit S (excerpt from Stephens deposition transcript) is

9   properly authenticated.  At least two of the exhibits were previously proffered and

10  authenticated by Westchester's declarants – Exhibit U (June 25, 2002 letter from plaintiffs'

11  counsel Neil Eisenberg to the Academy's insurance broker, also an exhibit to the Stephens

12  deposition) and Exhibit W (the Westchester policy).  One, Exhibit V (second amended

13  complaint filed in state court action) is self-authenticating.

14      However, 19 of the exhibits are either excerpts of the trial testimony from the state

15  court trial – collected as Exhibit A – or copies of documents that were admitted into

16  evidence in the state court trial – Exhibits B-R, and T.

17      Exhibit A includes what purport to be excerpts of trial testimony of a number of

18  witnesses.  However, the trial testimony is not authenticated (not certified by reporter) and

19  lacks foundation.  See Orr, 285 F.3d at 776-77.  Moreover, plaintiffs provide no clue as to

20  who these individuals are.  Indeed, Ms. Chang's declaration does not even provide the

21  witnesses' names.

22      Of the trial exhibits, some are documents that have also been submitted as evidence

23  by Westchester and/or Employers in their motions – e.g., Exhibit C (August 1, 2001

24  Degenkolb report); Exhibit E (November 21, 2001 Degenkolb report); Exhibit K (the August

25  28, 2002, license agreement); Exhibit L (the September 19, 2002, memo from Amir Firouz

26  to the Academy); and Exhibit M (the November 4, 2002, memo from Amir Firouz to the

27  Academy).  However, it appears that Exhibits B, D, F-J, N-Q, and T have not been

28  previously submitted as evidence with the insurers' motions and are not authenticated in

14

any way other than being identified as trial exhibits in the state court case. In addition, these exhibits lack foundation, are all inadmissible hearsay, and are not certified copies.

At the hearing on the present motions, plaintiffs' counsel Mr. Eisenberg attempted to argue that the state court trial transcript excerpts and exhibits should be admitted under Federal Rule of Evidence 901(b)(7) as "public records." Rule 901 provides that "[t]he requirement of authentication of identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a).

Rule 901(b) lists "examples of authentication or identification conforming with the requirements of" Rule 901. Fed. R. Evid. 901(b). Among these is the example of "Public records or reports," which provides that "[e]vidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept." Fed. R. Evid. 901(b)(7).

Evidence can be authenticated under this provision only where it falls into one of two categories – either "a writing authorized by law to be recorded and filed and in fact recorded or filed in a public office," or "a purported public record, report, statement, or data compilation, in any form." Wright & Gold, 31 Federal Practice and Procedure, Evidence § 7112 (2000 ed.) (citations and quotations omitted).

Examples of items falling into the first category are deeds, tax forms, court documents, maps, photographs, fingerprint cards, computer data maintained at public agencies, surveys, and sound or image recordings. See id. & nn. 6-26. While items in the second category may be in any form, something on the face of the item must identify it as having been a "public record." A stamp, seal, or other marking customarily affixed on an item upon its filing or during its custody will be sufficient. Id. & n.27.

If the item falls into one of these two categories, it may be authenticated as a public record " only if it is "from the public office where items of this nature are kept." Id. & n.39. Testimony from the custodian of public records or other evidence demonstrating that the

item has been in the public records may be sufficient to prove that it was recorded or filed in a public office. Id. & n.30. However, since items authenticated under Rule 901(b)(7) are not self-authenticating, the fact of public custody may not be assumed "merely from the item's appearance or testimony from a witness who has no knowledge of the item's provenance other than its appearance." Id. & n.38.

Exhibits A, B, D, F-J, N-Q, and T cannot be authenticated under Rule 901, as they do not satisfy the above-described requirements. Uncertified copies of testimony are "inadmissible in a summary judgment proceeding," and documents that have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment. Beyene, 854 F.2d at 1182 & n.1 (9th Cir. 1988). The statement in Ms. Chang's declaration that these are "true and correct" copies does not lay an adequate foundation for the admission of these exhibits into testimony. See id.; see also Orr, 285 F.3d at 774, 776.

2.      The Westchester policy

The Westchester policy provides, in part,

A.      COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1.      Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of Property.

        a.      Building, meaning the building or structure described in the Declarations, including:

                (1)     Completed additions;

                (2)     Fixtures, including outdoor fixtures;

                (3)     Permanently installed:

                        (a)     Machinery and

                        (b)     Equipment; . . . .

The policy is also subject to "Causes of Loss – Special Form" which bears number

16

CP 10 30 06 95.  This form, which is part of the policy, reads, in part:

A.    COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

    1.    Excluded in Section B, Exclusions; or

    2.    Limited in Section C, Limitations;

that follow.

B.    EXCLUSIONS

    1.    We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    . . .

    3.    We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c.  But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss

    . . .

        b.    Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

        c.    Faulty, inadequate or defective:

            (1)    Planning, zoning, development, surveying, siting;

            (2)    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

            (3)    Materials used in repair, construction, renovation or remodeling; or

            (4)    Maintenance;

        of part or all of any property on or off the described premises.

    3.    The Parties' Arguments

Westchester contends that the damages claimed by the Academy are excluded under Exclusion 3.c, the exclusion for faulty or inadequate workmanship or construction, taken together with Exclusion 3.b, the exclusion for "acts or decisions" of third parties.

17

Westchester also notes that Exclusion 3.c applies regardless of whether the "faulty workmanship" occurs "on or off the described premises," and asserts that negligent maintenance or construction on the adjacent Olympic Club property is therefore excluded as a cause of loss under the property.

In opposition, plaintiffs argue that the faulty workmanship and faulty construction of the Olympic Club and its contractor do not exclude coverage. Relying on Allstate Ins. Co. v. Smith, 929 F.2d 447 (9th Cir. 1991), and Century Theatres, Inc. v. Travelers Property Cas. Co. of America, 2006 WL 708667 at *8 (N.D. Cal., March 20, 2006), plaintiffs contend that faulty-workmanship clauses are ambiguous and should be read to cover the finished product, not the process that leads to the product.

In Allstate, a physician rented space in an office building for his medical practice. He bought an "all risk" commercial property policy from Allstate, which included exclusions for losses caused by "faulty workmanship" and rain. The language of the "faulty workmanship" exclusion was identical to the language at issue in the present action.

A portion of the roof was removed by a contractor hired to bring the building into compliance with earthquake standards. The contractor removed most of the roof but did not put a temporary cover over the exposed premises. It rained that night, and the doctor's office equipment was damaged. He submitted a claim, which Allstate denied based on the "faulty workmanship" exclusion.

The doctor argued that the phrase "faulty workmanship" was ambiguous, as it could be interpreted as either (1) the flawed quality of a finished product, or (2) a flawed process. The Ninth Circuit found, under the facts of the case, that the term "faulty workmanship" was ambiguous, and consequently applied the construction most favorable to the doctor, the insured. Allstate, 929 F.2d at 450.

The court first found that failing to put a temporary cover over the premises would not be "faulty workmanship" under the "flawed product of a finished product" interpretation, because the roof was not completed at the time of the damage, and there was therefore no finished product or object to evaluate. Id. at 449; see also id. at 450 (citing cases where

courts found "faulty workmanship" based on a defect in the object of the workmanship).

The court found, however, that under the "flawed process" interpretation, failing to put a temporary cover on while replacing a roof could constitute "faulty workmanship." Id. Indeed, the court found, interpreting the phrase as referring to the flawed quality of the product worked upon made sense in the context of the policy as a whole. Id. The court noted that another section of the policy provided coverage for losses "involving collapse of a covered building . . . caused by . . . use of defective materials or methods of construction."

Thus, the court concluded, if Allstate intended "faulty workmanship" to include losses resulting from flawed processes of construction, it could have borrowed language from the "collapse" section and stated, "We do not cover any loss or damage caused by . . . faulty . . . methods of construction." The court determined that Allstate's failure to do so led to a reasonable inference that Allstate did not intend for "faulty workmanship" to mean faulty methods of construction. Id. at 449-50.

In Century Theaters, the plaintiff entered into a contract for the construction of a 13-auditorium complex in Monterey, California, and purchased an "all risk" policy of property insurance for the project. The policy contained exclusions for "acts or decisions" of third parties, and for faulty workmanship and construction, in provisions essentially identical to the provisions at issue in the present case.

When the structure was partially completed, heavy rains fell, causing water to enter the interior of the building, which was not completely protected from water intrusion. Although the exterior walls were not damaged, the contractor had to remove and replace most of the drywall, ceiling tiles, and insulation. The plaintiff submitted a claim to the insurer, which was denied.

Relying on Allstate, the court found that the exclusion for faulty workmanship and construction was ambiguous under the circumstances of the case. Id., 2006 WL 708667 at *9. Moreover, in light of the similarities between the circumstances of the two cases, the court considered itself bound by Allstate on the question whether the "faulty workmanship"

19

1    exclusion governs construction processes.  Id.

2        The court finds that the decisions in Allstate and Century Theaters are inapposite.

3    Neither of those cases involved faulty construction, but rather building projects in which the

4    contractor simply failed to cover an open roof with a tarp to protect the inside of the building

5    from rain.  See Allstate, 929 F.2d at 449; Century Theaters, 2006 WL 708667 at *2.  By

6    contrast, the present case is premised on the claim that negligent or faulty construction by

7    Plant Construction and the Olympic Club caused damage to the Academy's building.

8        Moreover, plaintiffs have mischaracterized the holding in Allstate.  They claim that

9    under that decision, faulty workmanship clauses should be read to cover the finished

10   product, and not the process that leads to the product.  Actually, Allstate simply held that

11   the exclusion was ambiguous, under the circumstances of that case, because it could be

12   read to apply either to a finished product (the roof) or a process (the method of

13   construction).  Under the circumstances of the present case, however, the exclusion is not

14   ambiguous, as plaintiffs could have no claim for losses caused by the finished product.

15       Plaintiffs also claim that the language of Exclusion 3.c is ambiguous because the

16   phrase "of part or all of any property on or off the described premises" is excessively

17   vague.  They claim that this phrase seems to state that should any of the excluded

18   activities happen, at any property in the world and cause damage to the insured, the policy

19   would not apply.  Plaintiffs contend that such a reading would result in the policy being

20   completely meaningless, and that Westchester has not met its burden of establishing that

21   its interpretation of the policy is the only reasonable interpretation or that there is no

22   ambiguity in the policy language.

23       The court is not persuaded by this argument.  Courts have previously found policy

24   language virtually identical to the language in Westchester's policy to be unambiguous in

25   situations involving third-party negligence.  See Tzung v. State Farm Fire and Cas. Co.,

26   873 F.2d 1338, 1341 (9th Cir. 1989).  Moreover plaintiffs' interpretation misses the point,

27   because a first-party policy covers only the "described" premises – here, the "Covered

28   Property" – not all premises world-wide.  Exclusion 3.c plainly pertains to the loss or

1  damage caused by the enumerated items in Exclusion 3, including faulty, inadequate, or

2  defective construction "of part or all of any property on or off the described premises."

3      Plaintiffs also assert that this case is not controlled by <u>Wilson v. Farmers Ins. Exch.</u>,

4  102 Cal. App. 4th 1171 (2002); <u>Sapiro v. Encompass Ins.</u>, 221 F.R.D. 513 (N.D. Cal. 2004);

5  or <u>Tzung</u>, three cases cited by Westchester in its opening argument.

6      In <u>Wilson</u>, the owner of a house (Wilson) sold the house and carried the mortgage.

7  The mortgagor initially undertook some major renovations, which Wilson approved because

8  he believed they would add to the value of the house.  However, the mortgagor

9  subsequently stopped making the payments on the mortgage, and Wilson acquired the

10  property by foreclosure when the renovations were still unfinished.  He submitted a claim to

11  his property insurance company, and the claim was denied.

12      The court found that coverage was excluded from the policy under the "inadequate

13  renovation" or "repair" exclusion (an exclusion similar to the "faulty workmanship and

14  construction" exclusion in the present case).  The court held that where the named insured

15  or someone authorized by the named insured engages in renovation with the approval of

16  the mortgagee, the "inadequate renovation" exclusion precludes the mortgagee who is later

17  dissatisfied with the quality of the performance of the renovation from claiming coverage

18  because the renovation has left the property worth less than it was before.  <u>Id.</u> at 1176-77.

19      Plaintiffs contend that <u>Wilson</u> does not control because in that case, the named

20  insured authorized the renovations, whereas in the present case, the Academy never

21  agreed or contracted to have its building struck with heavy machinery, used for storage of

22  construction material, or damaged as a result of the negligent activity of the Olympic Club

23  or Plant Construction.

24      In <u>Sapiro</u>, the plaintiffs hired a contractor to build an addition onto their home.  The

25  contractor completed the project, but, unbeknownst to the plaintiffs, performed much of the

26  work negligently.  More than 20 years later, when the house was being remodeled, the

27  plaintiffs learned of the first contractor's negligent construction, which had caused extensive

28  damage.

1    The plaintiffs' insurance policy included an exclusion for faulty workmanship or

2  construction, similar to the exclusion at issue in the present case.  The court held that the

3  "faulty workmanship" provision excluded recovery for all losses caused by the first

4  contractor's negligent workmanship.  Sapiro, 221 F.R.D. at 521-23.

5    Plaintiffs argue that Sapiro is distinguishable because the claims in that case arose

6  out of the negligent workmanship by parties that were hired by the insured, and damage

7  caused by third parties' failure to act was specifically excluded by the policy.

8    In Tzung, the plaintiffs bought an apartment building in San Diego, and obtained an

9  "all risks" insurance policy on the building from State Farm.  Less than a year later, they

10  noticed a series of cracks in the drywall, stairway, and slab of the building.  The cracks

11  were allegedly caused by subsurface water that led to the expansion of soil under the

12  building.  State Farm denied the plaintiffs' claim, citing various exclusions in the policy,

13  including exclusions for inherent defects and faulty materials or workmanship.

14    The plaintiffs hired experts, who stated that the damage would not have occurred

15  had not the City of San Diego properly tested the soil, or had the contractor properly

16  constructed the building to withstand expansion of the soil.  The court held that losses

17  caused by third-party negligence in the design and construction of the building were

18  specifically excluded from the policy by the provisions for faulty workmanship and inherent

19  defects.  Tzung, 873 F.2d at 1340.

20    Plaintiffs argue, however, that Tzung is distinguishable because the plaintiffs in that

21  case were seeking compensation for construction defects that occurred prior to their

22  purchase of the building, and before the policy period commenced, whereas in the present

23  case, plaintiffs seek recovery for the negligent acts of a third party that occurred during the

24  policy period.

25    The court is not persuaded by these arguments.  The question here is whether

26  coverage is excluded under the "faulty construction" and "third party negligence"

27  exclusions.  Resolving that question does not depend on determining whether plaintiffs or

28  the Olympic Club authorized the construction or hired the contractor, or whether the alleged

22

1  damage occurred before the policy period began.

2       Moreover, plaintiffs provide no authority that supports their argument that the policy

3  exclusions should be read to apply only to negligent acts of the Academy – and not to

4  negligent acts of third parties.  Cases such as <u>Tzung</u> specifically contemplate the exclusion

5  of faulty and inadequate acts by a contractor.

6       Plaintiffs also argue that the Academy is entitled to coverage for its business losses.

7  They contend that even if third-party negligence is an excluded cause of loss under

8  Exclusion 3, they can recover for business losses because that is a "Covered Cause of

9  Loss" caused by the excluded cause of loss.

10      Plaintiffs claim that during the construction process, the storage of construction

11  materials on the sidewalk and the voids under the sidewalk ultimately made the sidewalk

12  unusable for ingress and egress, and the Academy was forced to move the 150 students to

13  another location.  Plaintiffs assert that they are entitled to recover for this loss of use,

14  regardless of the outcome of the claim for construction-related damage to the building

15  itself.

16      The court finds that the motion must be GRANTED, based on the policy exclusions

17  for faulty or inadequate workmanship and construction, and for acts or decisions of others.

18  Plaintiffs allege in the FAC that the cause of the loss was faulty or inadequate construction

19  by the Olympic Club or Plant Construction.  They assert that in the summer of 2001, the

20  Olympic Club and Plant Construction

21          engaged in construction on an adjacent lot that proceed [sic] to damage
            plaintiffs' property and has continued to damage said property up to today's
22          date.  Some of the damage consisted of discreet individual acts such as
            hitting the side of plaintiffs' property with a bulldozer and drilling into plaintiffs'
23          elevator pits; other damage consisted of negligently undermining plaintiffs'
            foundation which, in some portions of the building, have [sic] caused
24          continuous damage and, in other portions of the building, have [sic] caused
            discreet individual damage.
25

26  FAC ¶ 4.

27          At the time [plaintiffs' insurance carriers] denied the claim, plaintiffs' property
            had suffered 7/8 inch of settlement, had numerous doors and windows thrown
28          off center; had voids discovered under its floors, had a cracked and

                                        23

condemned sidewalk; had a hole penetrated into its elevator shaft and had detectable water adjacent to its foundation, threatening to further undermine its stability. In addition, plaintiffs were required to evacuate the building and suffered more than $1 million in loss of use because more than 100 students had to be located at plaintiffs' expense.

FAC ¶ 8.

In addition, Stephens testified in her deposition that plaintiffs were seeking recovery only for damages arising out of the alleged faulty construction and resulting business losses. Based on the allegations in the FAC and the admissions of Stephens, the court concludes that the present action involves the Academy's attempt to recover from its insurance companies for the negligent acts of the Olympic Club and its contractor Plant Construction during the Olympic Club project.

Plaintiffs have also failed to meet their burden of demonstrating a covered ensuing loss of business income. They provide no admissible evidence to support this claim, fail to identify the alleged "Covered Cause of Loss" that would provide coverage, and fail to meet their burden of showing that the Academy sustained a Covered Cause of Loss.

Under a first-party policy, the burden initially falls on the insured to prove that an event comes within the policy's basic coverage. The burden then shifts to the insurer to prove that the claim is excluded, if it is. See Garvey v. State Farm Fire & Cas. Co., 48 Cal. 3d 395, 406 (1989). Thus, in the present case, as the court has found that the "faulty construction" exclusion applies to preclude coverage, the burden would shift to the Academy to show that the excluded cause (faulty construction) resulted in a Covered Cause.

Plaintiffs, however, have submitted no evidence whatsoever to support their argument that a Covered Cause of Loss resulted from an excluded cause. They provide no details of what alleged Covered Cause occurred, how it happened, or why such an event should trigger coverage.

C.     Employers' Motion

Plaintiffs allege two causes of action against Employers – breach of contract, and breach of the implied covenant of good faith and fair dealing.

24

Employers argues, first, that any claimed settlement damage is progressive damage that first manifested before the Employers policy went into effect, and is therefore not covered under the policy; second, that the Employers policy expressly excludes business interruption coverage for this location, and that the Academy had decided prior to September 1, 2002, to vacate the students; third, that the alleged loss is in any event excluded by exclusions for settlement, earth movement, and/or acts and decisions of others; and fourth, that since there is no coverage under the Employers policy, and Employers' handling of the claim was reasonable, there can be no bad faith or punitive damages.

Because the court finds that the loss claimed by plaintiffs is excluded under the Employers policy, the following discussion addresses only the exclusions, and the question whether plaintiffs can establish insurance bad faith and entitlement to punitive damages, and not the other arguments raised by Employers.

1. Plaintiffs' Evidence

Plaintiffs' only evidence consists of 37 exhibits (Exhibits A-Z and AA-KK), purportedly authenticated by Ms. Chang. As with the evidence submitted in support of plaintiffs' opposition to Westchester's motion, some of the exhibits are self-authenticating (Exhibit V – the FAC), and others were previously proffered and authenticated by Westchester's declarants or Employer's declarants (e.g. – Exhibit C (August 1, 2001 Degenkolb letter); Exhibit E (November 21, 2001 Degenkolb letter; Exhibit K (the August 28, 2002, license agreement); Exhibit L (September 19, 2002, Firouz memorandum); and Exhibit M (November 4, 2002, Firouz memorandum).

However, much of the remaining evidence suffers from the same problems as the evidence submitted in support of plaintiffs' opposition to Westchester's motion. Exhibit A consists of excerpts of testimony from the state court trial – but provides no foundation and no reporter's certification for the transcript. Exhibits B-S and AA-GG are unauthenticated trial exhibits. Again, some of the trial exhibits are documents also provided as exhibits and properly authenticated by Employers and/or Westchester, but a number of the exhibits are

25

1    not authenticated, lack foundation, and are inadmissible hearsay.

2        2.    The Employers Policy

3        Employers issued a policy insuring various Academy properties located throughout

4    San Francisco against property damage and business interruption arising from covered

5    property damage.  The policy included an Endorsement providing that "loss of income"

6    coverage "does not apply at the covered location(s) shown in the Schedule of this

7    endorsement."  That location is the 655 Sutter building.

8        The policy provides further, in relevant part,

9        6.    PERILS INSURED AGAINST

10            We will pay for all direct physical loss to covered Real Property,
              unless the loss is excluded in 7. EXCLUSIONS of this form.

11        7.    EXCLUSIONS

12            A.    We will not pay for loss caused directly or indirectly by:

13                (1)    Wear and tear, deterioration, rust or corrosion, mold,
14                       wet or dry rot;
                  . . .

15                (6)    Settling, cracking, shrinkage, bulging or expansion of
16                       foundations, walls, floors, roofs or ceilings;
                  . . .

17                (13)   Acts or decisions, including the failure to act or decide, of
18                       any person, group, organization or government body;

19                (14)   Maintenance which results in damage to covered property.

20            B.    We will not pay for loss caused directly or indirectly by way of
                  any of the following . . .

21                (3)    Earth movement
22                  . . .

23            C.    We will not pay for loss to:
                  . . .

24                (2)    Buildings or structures . . . for the cost of making good:

25

26                       a.    Faulty or defective workmanship or material;

27                       b.    Fault, defect, error, or omission in design, plan
                             specification, zoning, developing, surveying, or siting.
28

26

3.      The Parties' Arguments

Employers argues that because no business interruption coverage is available to the Academy for the 655 Sutter building under the express terms of the policy, there can be no coverage for plaintiffs' claim for the cost of the alternative housing for the students.

Employers also contends that plaintiffs' claims are barred by the exclusions for "settling," "cracking," "acts or decisions" of others, "maintenance," and "earth movement." Employers argues that it is entitled to summary judgment because the losses alleged by the Academy fall under one or more of those exclusions.

In addition, Employers argues that since the policy does not provide coverage, the Academy cannot maintain a cause of action for bad faith. In order to establish bad faith denial of insurance benefits, a plaintiff must show that benefits due under the policy were withheld, and that the reason for withholding benefits was unreasonable or without proper cause. Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1151 (1990); see also Waller, 11 Cal. 4th at 36 (absent a contractual right, the implied covenant has nothing upon which to operate).

Employers argues that plaintiffs have no evidence that Employers' handling of the claim was anything other than reasonable, and summary judgment could therefore be granted on that basis alone. In a related argument, Employers contends that plaintiffs cannot state a claim for punitive damages as a matter of law, because they cannot show that Employers acted with the intent to vex, injure, or annoy with a conscious disregard of the Academy's rights.

In opposition, plaintiffs dispute Employers' assertion that the policy excludes coverage for business interruption; contend that the coverage sought is not excluded by the policy; claim that the bad faith cause of action and the claim for punitive damages are supported by Employers' improper closing of its claims file; and argue that the motion for summary judgment is premature because discovery is not complete.

With regard to the issue of coverage for business interruption, plaintiffs claim that an e-mail from the Academy's insurance broker to Employers shows that there was business

1  interruption coverage at the 655 Sutter location, and that there is therefore a genuine

2  disputed fact as to the existence of this coverage.  This e-mail, which is attached as Exhibit

3  HH to the Chang Declaration, is unauthenticated and is hearsay.  It also does not clearly

4  state what plaintiffs suggest it states.

5          Plaintiffs' second argument is that the coverage sought is not excluded by the policy.

6  Plaintiffs claim that Employers has simply asserted that damages relating to "cracking,"

7  "settling," "acts or decisions," and "earth movement" are excluded, but has failed to provide

8  sufficient facts supporting the proposition that the Academy's damages fall within one or

9  more of those exclusions.

10         Plaintiffs also contend that Employers' attempt to apply several different exclusions

11  suggests there are multiple causes of damage.  Plaintiffs claim that where there are

12  multiple causes of damage, there must be a determination of the efficient proximate cause

13  by the trier of fact.  Thus, plaintiffs assert, summary judgment would be improper.

14         With regard to the exclusion for settling and crackling, plaintiffs contend that they are

15  not claiming simple settling and cracking damages, but also damages from the voids under

16  the basement slab and the sagging of the basement floor.  Plaintiffs assert that such

17  damages are covered under the policy.  In support of this proposition, however, plaintiffs

18  simply cite to four pages of the Employers policy, without any explanation.  Plaintiffs also

19  claim that Employers fails to address the issue of "partial collapse," asserting that the

20  question whether 7/8" of settlement constitutes a "partial collapse" is an issue of fact.

21         With regard to the exclusion for "acts or decisions of others," plaintiffs argue that

22  Employers has failed to provide any facts showing that plaintiffs' acts or decisions caused

23  damage to the property, and has actually conceded that plaintiffs took great steps to

24  protect its property by hiring experts and so forth.  Plaintiffs contend that all the alleged

25  damage was caused by the Olympic Club and its contractors, and asserts that the

26  Employers policy does not specifically exclude coverage for the negligent acts of third

27  parties, and that such damage is therefore covered.

28         Plaintiffs assert that the "acts or decisions by others" language has been interpreted

to apply to negligent acts by the insured, and has not been applied to negligence of a third party.  In support of the first proposition, plaintiffs cite <u>Landmark Hospitality LLC v. Continental Cas. Co.</u>, 2002 U.S. Dist. LEXIS 27794 (C.D. Cal., July 2, 2002), and in support of the second proposition, <u>Garvey</u>, 48 Cal. 3d at 412-13.  Plaintiffs also attempt to distinguish the cases cited by Employers, on the basis that in those cases, the policy language specifically excluded third-party negligence, whereas the Employers policy does not distinguish between first-party and third-party negligence.

It is true that the court in the <u>Landmark</u> case did find that the "acts or decisions" exclusion could be applied to excuse the insurer from providing coverage for damages caused by the plaintiff's acts or decisions, but the court did not rule that the exclusion applied <u>only</u> to bar claims arising from the plaintiff's negligence, or that it did not apply to claims arising from a third party's negligence.  <u>See</u> <u>Landmark</u>, 2002 U.S. Dist. LEXIS 27794 at *7.  Similarly, plaintiffs' position is not supported by the <u>Garvey</u> decision.  The court finds that the exclusion barring coverage for "acts or decisions" of "any person [or] group" logically includes "acts or decisions" of third parties.

Plaintiffs also argue that the "No control" provision of the policy's "Conditions" section compels the conclusion that the "acts or decisions" exclusion does not apply to acts by third parties.  That provision states, "This insurance will not be affected by any act or negligence of any person, other than you, unless that person acts at your direction." However, this condition does not purport to limit coverage – it simply states that the <u>insurance</u> will not be affected by the act or negligence of any third person.

Plaintiffs' third argument is that the bad faith cause of action and claim for punitive damages are supported by Employers' improper closing of its claims file.  As noted above, after Employers' adjustor Mr. Thompson received the documentation of the alleged loss, he reviewed it and advised the Academy in mid-July 2003 that it should provide him with evidence of damage during the Employers policy period, and that absent such documentation, Employers would close its file in mid-August 2003.  When the Academy failed to provide such documentation, Employers advised in late September 2003 that the

file was closed.

Plaintiffs assert that Employers closed its file before it had undertaken any investigation. According to plaintiffs, if Employers had conducted a "reasonable investigation," it would have determined that at least some of the Academy's damages were covered. Plaintiffs also contend that it can maintain its bad faith cause of action because it has a viable claim for coverage under the Employers policy.

Plaintiffs argue that Employers' evaluation of the claim was not reasonable, citing Exhibit JJ to the Chang Declaration, Employers' "activity log," which is purportedly an exhibit from adjustor Richard Thompson's deposition (although the relevant pages from the Thompson deposition transcript are not attached). This is a 12-page document that is difficult to read. The Academy cites to one page of this document – LM1604 – and claims that this reflects a notation by Mr. Thompson that there is "no damage." The court reviewed this page and did not find such a notation. The court did find a statement on LM 1603 dated July 2, 2003, stating "Documents reviewed. No evidence of any physical loss occurring during our policy period. Position letter prepared."

This activity log, according to plaintiffs, shows that Employers did not engage in any investigation other than reviewing the documents that the Academy had sent, and that Mr. Thompson, in particular, never even interviewed anyone from the Academy, and did not visit the site until June 4, 2004, more than a year after the claim was submitted. Plaintiffs contend that this inadequate and untimely investigation constitutes bad faith.

Similarly, plaintiffs assert that punitive damages are proper, given Employers' failure to investigate and the improper closing of the file. They claim that the manner in which the file was closed represents a conscious disregard of plaintiffs' rights. They assert that Employers declined an invitation to speak with plaintiffs' engineer regarding the claim, preferring to keep the file closed (citing to Mr. Eisenberg's letter of September 5, 2003, which Employers received on September 10, 2003, and Mr. Thompson's reply dated September 25, 2003).

The court finds that Employers' motion must be GRANTED. There is no dispute that

the business interruption coverage was excluded for the 655 Sutter location under the Employers' policy. Plaintiffs do not dispute that the policy includes an endorsement that specifically excludes damage for business interruption. As for the e-mail that the Academy relies on, the following page refers to and describes the specific exclusion for the 655 Sutter property. ("We will also exclude BI/EE at 655 Sutter due to possible claim at this location.")

Moreover, any loss is excluded under the terms of the policy. With regard to the "acts or decisions of others" exclusion, it is not true that such an exclusion does not apply to acts of third parties.

Thus, because the Employers' policy provides no coverage, plaintiffs cannot maintain a cause of action for bad faith or a claim for punitive damages. Plaintiffs have not established any property damage during the Employers policy period, and have not advanced a plausible theory of coverage. Thus, the question whether the claim was handled in good or in bad faith does not arise, nor does the question of entitlement to punitive damages.

Plaintiffs also argue that the motion for summary judgment is premature because discovery is not complete – specifically, discovery of facts relating to Employers' claims handling, investigation, and denial of the Academy's claim. It is not clear, but plaintiffs may intend this argument as an attempt to seek a continuance under Federal Rule of Civil Procedure 56. Rule 56 provides that the court may deny the motion or order a continuance, if the opposing party shows by declaration that "the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed. R. Civ. P. 56(f).

Plaintiffs argue that they are "unable to oppose Employers' summary judgment motion to the fullest extent because material and relevant facts relating to [Employers'] claims handling, investigation and denial in response to Plaintiffs' tender of property damage claim have not been produced." Additionally, they assert, "Westchester and [Employers'] employees have not been deposed yet," and both insurers have agreed to

1    produce 30(b)(6) witnesses.

2          On the other hand, according to plaintiffs, the insurers have taken depositions of

3    plaintiffs' witnesses, attended or received transcripts of depositions in the state court action,

4    and attended the trial.  Plaintiffs claim that the fact that the insurers brought these motions

5    prior to completion of discovery has put plaintiffs at a great disadvantage, particularly since

6    the facts are in the insurers' possession.  They contend that Employers' motion is also

7    "premature" because plaintiffs "have not had an adequate opportunity to develop their

8    claims through discovery before this motion," and that the motion should be denied, or "a

9    continuance should be granted."

10         To obtain postponement or denial of a summary judgment motion for further

11   discovery, the opposing party must submit a declaration showing (a) facts establishing a

12   likelihood that controverting evidence may exist as to a particular material fact, (b) the

13   specific reasons why such evidence cannot be presented in opposition to the motion at the

14   time, and (c) the steps or procedures the opposing party intends to utilize to obtain such

15   evidence.  See Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial

16   (2007) § 14:114.  Plaintiffs have not provided such a declaration, and have not met their

17   burden under Rule 56(f).

18         Moreover, this case has been pending for almost four years.  Even allowing for the

19   stay imposed by the court – at the parties' request, during the pendency of the state court

20   action – plaintiffs have had more than ample opportunity to conduct discovery.  Indeed,

21   non-expert discovery in this case closed on November 21, 2007.  The motions for summary

22   judgment were filed on December 12, 2007, in accordance with the court's pre-trial order.

23         The fact that plaintiffs failed to complete its discovery by the dispositive-motions

24   filing date provides no justification for the court to decline to rule on the present motions.

25   Plaintiffs have made no showing of good cause to modify the scheduling order, and offer no

26   excuse for their lack of diligence in pursuing discovery in this matter.

27                                     **CONCLUSION**

28         In accordance with the foregoing, the court finds that Westchester's motion for

1    summary judgment must be GRANTED, and that Employer's motion for summary judgment

2    must be GRANTED.

3         The trial date is VACATED. The clerk is ordered to close the file.

4

5    **IT IS SO ORDERED.**

6    Dated: February 19, 2008

7                                     PHYLLIS J. HAMILTON

8                                     United States District Judge